973 F.2d 1391
 Fed. Sec. L. Rep. P 96,979
Robert L. DAVIDSON; Guenther R. Roth, Appellants,
v.
Thomas C. WILSON; Winthrop Securities Co., Inc.; Winthrop
Financial Associates, a limited partnership, a
Maryland limited partnership, Appellees.
 No. 91-2136.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 11, 1991.
Decided Aug. 26, 1992.
 
 1
 John LeFevre, Minneapolis, Minn., for appellants.
 
 
 2
 Rebecca Bender, Minneapolis, Minn., for appellees.
 
 
 3
 Before BEAM, Circuit Judge, LOKEN, Circuit Judge, and KAUFMAN,* Senior District Judge.
 
 
 4
 FRANK A. KAUFMAN, Senior District Judge.
 
 
 5
 Appellants, Robert L. Davidson and Guenther R. Roth, commenced this action in May 1989, against appellees Thomas C. Wilson ("Wilson"), Winthrop Securities Company, Inc. ("Winthrop Securities") and Winthrop Financial Associates ("Winthrop Financial"), a limited partnership. Wilson acted as agent on behalf of Winthrop Securities. The latter, in turn, was owned by Winthrop Financial. Davidson and Roth claim they were wrongfully induced by appellees to invest in Wilcap Holding Limited Partnership ("Wilcap") by appellees' misrepresentations concerning allocations of tax losses, rates of return, and cash distributions available to the investor. The seven-count complaint included the following claims: violations of the Securities Exchange Act of 1934 and Rule 10b-5; violations of sections 17 and 12 of the Securities Act of 1933; violations of the securities laws of Minnesota and Massachusetts; RICO violations; common-law misrepresentation; and breaches of fiduciary duty.
 
 
 6
 Appellees filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, because papers other than pleadings were filed in support of that motion, the district court treated that motion as one for summary judgment under Rule 56 and in an Opinion and Order dated March 6, 1990, 763 F.Supp. 1465, granted summary judgment in favor of appellees as to all of appellants' allegations except for those asserting common law misrepresentation and RICO violations. Subsequently, in an Opinion and Order dated April 10, 1991, the district court granted summary judgment with regard to the remaining claims of appellants. 763 F.Supp. 1470. In this appeal, appellants challenge the granting by the district court of summary judgment as to all of their claims other than those for breach of fiduciary duty and violations of RICO.
 
 I.
 BACKGROUND
 
 7
 Wilcap was formed for the sole purpose of purchasing 1,000 units in another limited partnership known as Winthrop California Investors Limited Partnership (WCI), a limited partnership which owns real estate in California. Winthrop Financial, which, as indicated supra, owns Winthrop Securities, is the general partner of Wilcap. Limited partnership units in Wilcap were a separate syndication pursuant to which benefits arising from special allocations of cash distributions and tax losses by appellees were promised. Davidson and Roth each contend that Wilson fraudulently promised the special allocations of tax losses and the cash distributions in order to induce each of appellants to invest in the Wilcap partnership.
 
 II.
 The Davidson Transaction
 
 8
 Davidson is a wealthy real estate development lawyer who is a partner in a Minneapolis law firm. He has been practicing law for approximately 35 years and is experienced in both investments and commercial law practice. Davidson initially became aware of the Wilcap investment opportunity when he was contacted by one of his former accountants--James Weichert--who had discussed the investment with Wilson. During a three-way telephone conversation on September 19, 1986, involving Weichert, Wilson, and Davidson, the latter states that Wilson informed him that a $105,000 investment in Wilcap made in September, 1986 would provide Davidson a 1986 tax loss of approximately $132,000 and annual cash flow distributions of $6,000 in 1986, and $7,000 in 1987, and, thereafter, cash flow distributions which would annually increase at the rate of 6% per year until the project's end in 1996. In addition, Davidson claims that Wilson told Weichert and himself during that discussion on the telephone that Davidson would receive a total of $200,000 in cash distributions over the ten-year life of the project and would realize $195,000 to $200,000 from the sale of the residual interest in the project.
 
 
 9
 In a subsequent three-way telephone conference among the same three persons on September 24, 1986, Davidson says that Wilson said that written confirmation of the special allocations under Wilcap could not yet be provided by him, Winthrop Financial or Winthrop Securities, and that Wilson also stated that if he (Wilson) did get new numbers, "he would have to rescind all sales and start over" and Wilson did not want to incur that expense. After Davidson requested written verification of new cash flow numbers, Wilson, according to Davidson, stated that the numbers were not yet available in writing but stated that Davidson would soon receive written confirmation of the "new numbers."
 
 
 10
 Davidson asserts that on September 24, 1986, Wilson also provided information about the underlying transaction--the WCI investment. According to Davidson, it was the latter information which led Davidson--who acknowledges he is experienced in real estate transactions--to conclude that Wilcap could deliver the promised benefits. Wilson, according to Davidson, informed the latter during the September 24, 1986 discussion that Wilson and his partners had purchased 1,000 units in WCI without even considering the tax ramifications. Wilson allegedly represented that an attractive feature of the Wilcap investment was that appellees could offer a combination of tax benefits and cash flows because they were specially allocated by the general partner of Wilcap--Winthrop Financial.
 
 
 11
 Davidson also alleges that in one or more of the above referred-to discussions, Wilson stressed the need for Davidson to act quickly because the special benefits would not be available if Davidson delayed beyond September. Davidson decided to purchase a unit in Wilcap immediately following the September 24, 1986 telephone conversation. Davidson then sent a personal check for $105,000 to Wilson at Winthrop Securities. Davidson alleges Winthrop Securities accepted Davidson's check without first obtaining from Davidson a signed Wilcap Subscription Agreement or a signed investor questionnaire.[1]
 
 
 12
 Davidson was admitted to the Wilcap limited partnership on September 30, 1986. Davidson states that Winthrop sent to Davidson on November 5, 1986 only the single signature page of the Subscription Agreement which Davidson then executed on November 10, 1986. According to Davidson, the cover letter did not identify the document to which that signature page related. Nevertheless, Davidson simply signed and returned that single sheet.
 
 
 13
 Thereafter, in March 1987, Davidson states that he received his Schedule K-1, and, upon such receipt, he questioned, in a series of written and telephone inquiries, why he was not receiving the cash flow he had been promised. According to Davidson, Wilson stated that appellees had "screwed up" and that Wilson would "make book," i.e., make good, on the tax losses and cash flows.
 
 III.
 The Roth Transaction
 
 14
 Roth apparently was the former president of a large personal care products company which had been sold to the Gillette Company for $30 million in 1986. By the end of 1986, in order to shelter his income from that sale as well as from other sources, Roth had invested in over 100 tax shelters and was thoroughly familiar with standard documentation which accompanied the sale or transfer of such shelters. Like Davidson, Roth indicated on his investor questionnaire that he was a sophisticated investor and was not in need of a purchaser representative to assist him in weighing the risks and benefits. Roth had been a client of Wilson and of Winthrop Securities prior to investing in Wilcap. Jerald Shaw, acting as Roth's agent, had purchased several real estate investments from Wilson and, earlier in 1986, Roth had purchased a limited partnership in WCI--the underlying transaction for Wilcap. Later in 1986, Roth says that Wilson proposed to Shaw that Roth make the Wilcap investment; and that at a meeting with Shaw and Weichert--Davidson's former accountant, who had been involved in Davidson's investment in Wilcap--Wilson represented to Shaw that an investment in Wilcap would provide a 3 to 1 tax write-off in 1986 and an 8% annual cash flow on the total investment.
 
 
 15
 In response to questions from Shaw and Weichert, Shaw states that Wilson said that written financial information was not available but would be forthcoming in the future; and that during the meeting, Wilson gave Shaw a single sheet entitled "Winthrop Holding Limited Partnership," but that the typewritten information on the sheet did not describe Wilcap although the handwritten notations on that sheet reflected cash flows available to a Wilcap investor.
 
 
 16
 At Wilson's invitation, Shaw says that he and another person traveled to California to view the WCI investment; and that while viewing the investment, Wilson again told Shaw, in the presence of that third person, that Roth would obtain a 3 to 1 tax write-off for 1986 as well as an 8% return on investment generated from the net cash flows of the project. In response to questions from the said third person, Shaw states that Wilson reiterated Wilson's assurance that the benefits would be as promised and that the benefits would be delivered through special allocations by appellees to the Wilcap investors.
 
 
 17
 In a subsequent telephone conversation, Shaw alleges that Wilson advised Shaw that Roth had to act quickly because the promised benefits soon would be unavailable. On Shaw's recommendation and in reliance upon Wilson's statements, Roth asserts that he accepted Wilson's offer and purchased five units in Wilcap for a total price of $475,000. Roth states that Shaw mailed a check for $100,000 to appellees on October 8, 1986 and sent the $375,000 balance by wire transfer to appellees on or about October 28, 1986 and that appellees received the all of the same. Roth also alleges that he was admitted as a Wilcap limited partner on October 31, 1986.
 
 
 18
 Roth asserts that sometime after November 4, 1986, he received a single signature page from the Wilcap Subscription Agreement, and that, as was the case with Davidson, the cover letter did not identify the purpose for which Roth's signature was required, except to state that it was needed for Roth's participation in the Wilcap partnership. Roth says that he signed and returned the signature sheet.
 
 
 19
 Roth asserts that he did not receive either the 1986 tax write-offs or the cash flows promised by Wilson; and that on the K-1 statement received by Roth, dated March 26, 1987, the tax loss ratio was less than 1 to 1 and the cash flow distribution for 1986 was less than one-half of one percent. Roth states that subsequent cash distributions have similarly fallen short of what had been promised. When Shaw contacted Wilson to determine the cause of the discrepancies between benefits received and those promised, Wilson, according to Shaw, allegedly advised Shaw to determine the injury which Roth had suffered and stated that appellees or Wilcap would take care of the problem.
 
 
 20
 Both Davidson and Roth assert that at the times Wilson discussed with each of them or their respective agents, the Wilcap investments, Wilson failed to direct either of them to a written communication entitled "Wilcap Holding Confidential Memorandum" which was dated August 1, 1986. That Confidential Memorandum apparently contained written financial projections, warnings, and disclaimers for such an investment. Davidson and Roth further state that neither of them learned of that document until after they had made their separate investments.
 
 IV.
 Appellees' Version of the Transaction
 
 21
 Although appellees dispute appellants' version of the facts of this case--particularly appellants' assertion that they did not receive the Wilcap Confidential Memorandum prior to investing--appellees assert that even accepting as true each and all of appellants' allegations, the appellants, as sophisticated investors could not justifiably have relied upon appellees' alleged oral projections. Further, appellees assert that Davidson's and Roth's vague allegations of concealment do not operate to toll the section 12 limitations period contained in section 13 of the Securities Act of 1933--see 15 U.S.C. §§ 77l & 77m--in the light of the fact that Davidson and Roth both admit that they waited for over a year--during which time no promises were made to them by appellees--before bringing the within cause of action under 15 U.S.C. § 77l.
 
 
 22
 A. The Davidson Transaction.
 
 
 23
 Appellees point out, and Davidson concedes, that Davidson consulted with two independent advisers, both accountants with "Big Eight" firms, before making his investment. In addition, although Davidson asserts that he was only sent the single signature page following his becoming a member of the partnership, Davidson did acknowledge during his deposition that he had available to him the Wilcap Subscription Agreement before he purchased the Wilcap unit and that he at least "skimmed though it very quickly" before the purchase. Further, Davidson's affidavit contains an admission that he signed the Subscription Agreement in September, 1986, before he was admitted as a partner.
 
 
 24
 Appellees strongly urge that the record incontrovertibly establishes that Davidson had a Subscription Agreement in his possession before or at the time he decided to invest in Wilcap and that Davidson had at least cursorily reviewed it. Those facts would appear to be established by Davidson's own admissions as set forth in paragraph 7 of Davidson's affidavit, which reads, in relevant part, as follows:
 
 
 25
 Prior to sending in the purchase price for the Class B unit, I told Wilson I had mailed my subscription and had not yet received a confidential offering memorandum for Wilcap Holding Limited Partnership. In fact, although the subscription agreement which I signed states that I had received and read both the WCI Memorandum and the 'WH Memorandum,' I did not receive any so called 'WH Memorandum' pertaining to the Wilcap Holding Transaction, or the WCI Memorandum. I signed without receiving any such documents because I was told I had to sign the agreement in September 1986 to get the promised benefits.
 
 
 26
 Joint Appendix, at 279. That is a clear statement by Davidson that he himself mailed a Subscription Agreement "prior to sending in the purchase price," and that Davidson was on notice at that time of the existence of the WCI Memorandum and the WH Memorandum. The record also demonstrates that one of Davidson's advisers had received the WCI Confidential Memorandum in the Fall of 1985.
 
 
 27
 B. The Roth Transaction.
 
 
 28
 Although Roth states that he did not sign his Subscription Agreement prior to being admitted as a Wilcap partner, the record establishes that both Roth and his adviser, Shaw, received a Subscription Agreement prior to Roth's decision to invest. Roth's affidavit states that the Subscription Agreement was provided to him in the Fall and, after signing the agreement, he returned to it the appellees. Further, Roth admits that he received a copy of the WCI Confidential Memorandum prior to investing in Wilcap.
 
 
 29
 Although Roth was not deposed, the deposition of Shaw, his investment adviser and agent, was taken. In Shaw's deposition, the latter stated that he had seen the Subscription Agreement on October 21, 1986, when Roth signed it, before Roth sent in his final purchase payment and before Roth became a member of the Wilcap partnership. Shaw has also stated that although he never saw the Confidential Memorandum prior to the filing of the lawsuit, neither did he press Wilson for a copy of the Memorandum.
 
 V.
 The Wilcap Subscription Agreement
 
 30
 The Wilcap Subscription Agreement, which both Davidson and Roth admit they had in their possession prior to becoming members of the partnership, contained language referring to the Wilcap and WCI Offering Memoranda and specific exhibits thereto. In particular, the Subscription Agreement contains the following language:
 
 
 31
 3. The Principal [the investor] understands and acknowledges that:
 
 
 32
 F. Any federal or state tax results of an investment in Units [limited partnership interests], including those set forth in the Financial Exhibit to the WCI Memorandum or in Exhibit C to the WH Memorandum, are not susceptible to absolute prediction, and audit adjustments to Partnership returns or returns of individual Partners, new developments in rulings of the Internal Revenue Service, court decisions or legislative or administrative changes may have an adverse effect on one or more of the tax consequences sought by the Partnership.
 
 
 33
 ....
 
 
 34
 I. The Financial Exhibit to the WCI Memorandum and Exhibit C to the WH Memorandum have been included therein for purposes of illustration only, and no assurance is given that actual results will correspond with the results contemplated therein.
 
 
 35
 ....B.1. The Principal hereby represents, warrants and agrees that:
 
 
 36
 F. The Principal has carefully read the WCI Memorandum and the WH Memorandum. The Partnership has made available to him and/or his attorney and/or his accountant and/or his purchaser representatives all documents that he or they have requested relating to an investment in the Partnership and has provided answers to all of his or their questions concerning the offering and an investment in the Partnership. In evaluating the suitability of an investment in the Partnership, the Principal has not relied upon any representations or other information (whether oral or written) other than as set forth in the WCI Memorandum and WH Memorandum or as contained in any documents or answers to questions so furnished to him by the Partnership.
 
 
 37
 G. The Principal recognizes that the Partnership has no financial or operating history and investment in the Partnership involves certain risks, and he has taken full cognizance of and understands all of the risks related to the purchase of WH Units, including but not limited to, those set forth under the captions "Risk Factors" and "Income Tax Consequences" in the WCI Memorandum and "Risk Factors" in the WH Memorandum.
 
 
 38
 Joint Appendix at 37, 38, 40, 48, 49 & 51 (emphasis added).[2]
 
 
 39
 Appellees contend that Davidson and Roth should have, under the circumstances, before they could justifiably rely upon representations made to them by or on behalf of appellees, obtained and read the written materials referenced in the Subscription Agreement in accordance with the acknowledgment in the Agreement, which each of them executed. Further, appellees take the position that, given the specificity of the references to other written materials, the fact that one of Davidson's advisors had received at least one of those referenced documents and Roth himself had received that document, neither of appellants was entitled blindly to rely upon Wilson's alleged contrary representations.
 
 VI.
 The Limitations Bar of Section 13
 
 40
 One of the causes of action stated by Davidson and Roth is based upon Section 12(2) of the Securities Act of 1933. The timeliness of a section 12 claim is governed by section 13 of the Act, which requires that an action under section 12(2) be brought within one year of the omission, or of the discovery of the omission--by the exercise of reasonable diligence--but, in any event, no later than three years after the sale of the security at issue.
 
 
 41
 Appellees contend that upon their receiving a Schedule K-1 in March 1987, Davidson and Roth should have been on notice that something was amiss. In Davidson's case, Davidson's tax loss was $118,945 rather than Wilson's alleged representation of $132,000. While that discrepancy might not be viewed as alarming, Davidson's cash distribution was $481 rather than the promised $6000. Roth's K-1 shows a $447,414.65 tax loss rather than the allegedly promised $1,425,000; Roth's cash distribution was $1,800 rather than the promised $40,000.
 
 
 42
 A period of two years elapsed between Davidson's and Roth's receipt of their respective K-1's and the date they instituted the within case including their respective section 12 claims, i.e., May 1989. Although both Davidson and Roth assert that they were lulled into inactivity by Wilson's continued assurances that the partnership would make good on his promises, the court below found that Davidson and Roth failed to produce sufficient evidence to suggest that either of them had exercised reasonable diligence. The court below based that finding upon the fact that Davidson and Roth had executed documents which explicitly stated that they were not to rely upon any oral representations made by any salesman and because Davidson and Roth received K-1's which showed rather large discrepancies between results promised and those actually received.
 
 
 43
 In addition, Davidson--by his own affidavit--indicates that between early June 1987 and late September 1988, neither he nor his representative pressed any claim made by him in this case. Likewise, Roth, in his affidavit, indicates that he did nothing in that regard between the spring of 1987 and the spring of 1988. During those periods, in addition, neither Roth nor Davidson allege that appellees made any representations at all to either or both of them.
 
 VII.
 DETERMINATIONS BY THE DISTRICT COURT
 
 44
 The court below in its first Opinion and Order dated March 6, 1990, determined that appellees' motion to dismiss--treated as a motion for summary judgment--involved interpretation of a contract, a task which is generally for the court. The court observed that in order to recover under Rule 10b-5, each of appellants must show a connection between Wilson's misrepresentations and his investment in Wilcap, and that he cannot recover if his reliance upon those misrepresentations was not reasonable. The district court commented that the written offering materials received by Davidson and Roth contradicted the oral representations made by Wilson. In that context, the district court concluded that investors such as Davidson and Roth may not justifiably close their eyes to the written materials and rely only upon the oral statements, and that Davidson and Roth accordingly are charged with constructive knowledge of the written materials available to them. In the district court's view, Davidson and Roth did not present sufficient evidence to demonstrate that either of them reasonably relied upon the oral statements in the light of the fact that each was a sophisticated investor. Therefore, the district court rejected appellants' contentions that Wilson's statements could have misled the appellants and concealed from each of them the fraud. Rather, the district court concluded that neither of appellants should have closed their eyes to the written materials which contained express warnings not to rely on oral representations. In that context, the district court determined as a matter of law that Davidson's and Roth's failures to make further inquiries based upon the written materials available to them were not justified.
 
 
 45
 As to the section 12(2) claims stated by Davidson and Roth, the district court held that they were barred under section 13. That section imposes a reasonable diligence standard; the time period for filing a section 12(2) claim begins to run when a plaintiff has enough facts to be on notice of a potential claim. The court below found that Davidson and Roth had notice of their potential claims in March of 1987, when they each received a Schedule K-1 for 1986 indicating a significant discrepancy between the cash distributions and tax losses promised and those actually received, and determined that Davidson and Roth had failed to produce sufficient evidence demonstrating that either of them had, prior to May 1988, one year before the date this case was instituted, exercised reasonable diligence to discover their respective causes of action under section 12(2).
 
 
 46
 Finally, the court below ruled that Davidson's and Roth's state securities law claims should be dismissed on the same basis that the court relied upon in dismissing the Rule 10b-5 claims, namely, that appellants did not show justifiable reliance upon Wilson's oral representations.[3]
 
 
 47
 In a second Opinion and Order dated April 10, 1991, the court below granted summary judgment to appellees on the two remaining claims--RICO and Minnesota common-law fraud. Davidson and Roth contend that they invested in Wilcap based only upon Wilson's oral representations and prior to receiving the Subscription Agreements. The district court ruled that "[w]hether or not plaintiffs signed the subscription agreements after they made their investments does not create a genuine issue of fact since they both acknowledge receiving the subscription agreements prior to investing." The court also observed that the Subscription Agreement makes repeated references to other written materials which would have put a reasonable investor on notice of the existence of the documents, notwithstanding contrary statements allegedly made by Wilson. The district court further noted that Minnesota's common-law fraud requirements also include reasonable reliance, and stated that Davidson and Roth could not establish that essential element of their respective claims.[4]
 
 VIII.
 SUMMARY JUDGMENT IN THIS CASE
 
 48
 This Court's review of a grant of summary judgment is governed by the same standard as that applied by the district court. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir.1986). Thus, we are required to view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 577, 106 S.Ct. 1348, 1351, 89 L.Ed.2d 538 (1986). We may affirm the court below only if we find that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Stenzel v. Ellis, 916 F.2d 423, 424 (8th Cir.1990).
 
 
 49
 As a threshold matter, Davidson and Roth assert that genuine issues of material fact precluded the lower court from granting summary judgment. However, the district court's Opinions and Orders of March 6, 1990 and of April 10, 1991 reveal full acceptance by that court of Davidson's and Roth's versions of the facts, and that court's determination, as a matter of law, that notwithstanding the alleged oral misrepresentations made by Wilson, Davidson's and Roth's reliance upon those representations was unjustified because Davidson and Roth, as sophisticated investors, should have been on notice not to rely upon those representations. That is so, reasoned the court below, because Davidson and Roth acknowledged in their affidavits that they each had copies of the Subscription Agreement prior to making their investments.[5] The district court, referring to the numerous caveats and disclaimers contained in the Subscription Agreement as well as the references in it to other documents, determined that such references made a sophisticated investor's reliance upon contrary oral representations unreasonable as a matter of law.
 
 
 50
 Thus, the key issue in this appeal is whether the lower court's determination that such reliance was unjustifiable as a matter of law is correct. Appellants assert that, in particular, the fact that the Confidential Memorandum--referenced in the Subscription Agreement--was not made available to them before investing precludes summary judgment on the reliance issue.
 
 
 51
 In a misrepresentation claim made under Rule 10b-5, a plaintiff must establish that the defendant, with scienter, made a false representation of material fact, upon which plaintiff justifiably relied to his detriment, in connection with the purchase or sale of a security. See Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1516 (10th Cir.1983). "Justifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b-5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm." Id.
 
 
 52
 Based upon a review of the cases from other circuits, the Tenth Circuit in Zobrist observed that whether reliance is justifiable depends upon the specific factual situation. That review yielded the following "relevant factors in determining whether reliance was justifiable":
 
 
 53
 (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.
 
 
 54
 Id. at 1516 (citations omitted).[6] "No single factor is determinative; all relevant factors must be considered and balanced to determine whether reliance was justified." Id. at 1516-17. See also Kennedy v. Josephthal & Co., Inc., 814 F.2d 798, 804 (1st Cir.1987).
 
 
 55
 In this case, Davidson and Roth acknowledge that they are each sophisticated investors. Davidson had never dealt with Wilson before although Wilson apparently was known to Davidson's former accountant--Weichert--who also acted as an advisor to Davidson in the transaction at issue. As to Roth, he had been a client of Wilson and Winthrop Securities. Shaw, acting as Roth's agent, had purchased "several" real estate investments from Wilson; however, there is no indication that there necessarily was a longstanding, close relationship of trust between Roth (or, more particularly, his agent) and Wilson.
 
 
 56
 As to the factor of access to relevant information, Davidson and Roth have admitted that they each did have access to information which repeatedly indicated the existence of two other memoranda and which described, in general terms, the contents of those memoranda and made reference to specific attachments thereto. However, Davidson and Roth assert that although they repeatedly questioned Wilson about such documents, they were told that there were no such documents.
 
 
 57
 The district court determined, and we agree, that no fiduciary relationship existed between Davidson and Roth and the appellees at the time the alleged misrepresentations were made.[7] Indeed, Davidson and Roth do not press before this Court the contention made below that appellees breached their fiduciary duty.
 
 
 58
 There is no indication in the record in this case that appellees concealed the alleged fraud. As emphasized supra, the Subscription Agreement contained disclaimers and other warnings stated in the strongest of terms. In addition, that Agreement explicitly referred to memoranda which Wilson stated did not exist.
 
 
 59
 As to whether Davidson and Roth had the opportunity to detect the fraud, the record reveals that they each were on notice that Wilson's oral assertions contradicting the Subscription Agreement were cause for concern. Davidson and Roth both assert that they raised such worries with Wilson and were told that no such written documents existed.
 
 
 60
 In this case, Wilson apparently initiated the transaction rather than Davidson or Roth. Finally, the misrepresentations were quite specific--tax losses and cash distributions of specific amounts were promised. Also the Subscription Agreement contained explicit disclaimers regarding the specific dollar values associated with the investment.
 
 
 61
 Application of the eight factors enumerated in Zobrist dictates the conclusion that a sophisticated investor, confronted with a written document which contained repeated references to two other documents--which the investor had been orally informed did not exist--and that also contained explicit disclaimers concerning representations as to dollar values associated with the investment, did not justifiably rely upon any contradictory oral representations. There was seemingly ample reason for Davidson and Roth to take the position, that they would not move ahead and make investment payments until such references and representations were clarified to their satisfaction. Thus, we agree with the district court that, based upon the facts of this case, appellants' claimed reliance upon Wilson's oral representations was unjustifiable as a matter of law.
 
 
 62
 Justifiable reliance is also a necessary element to state a claim under the two state securities laws relied upon by appellants; therefore, the lack of justifiable reliance which negates appellants' Rule 10b-5 claims also dooms their state securities laws claims. Appellants concede that a required element of their fraud claims under Minnesota common law is justifiable reliance. Nevertheless, they assert that under Minnesota law, "reliance on an oral representation is unjustified as a matter of law only if the written contract directly contradicts the oral representation ... [W]here there [is] not a direct contradiction between the prior oral representation and the terms of the written contract, the question of justifiable reliance [is] for the trier of fact." St. Croix Printing v. Rockwell Int'l Corp., 428 N.W.2d 877, 882 (Minn.Ct.App.1988). But St. Croix is of little or no assistance to appellants in this case because the oral representations did directly contradict the terms of the written contract: e.g., on the one hand, specific dollars amounts were orally promised; on the other hand, the written contract disavowed the ability to predict specific dollar amounts.
 
 
 63
 There remains for comment the 12(2) and 13 issues with respect to the appellants' 1933 Act claims. Section 12(2) of the 1933 Securities Act provides a cause of action against anyone "who 'offers or sells a security' by means of a false or misleading prospectus or oral communication." Hagert v. Glickman, Lurie, Eiger & Co., 520 F.Supp. 1028, 1034 (D.Minn.1981). Section 13 of that Act governs the timeliness of a claim filed under section 12(2). Section 13 provides, in part:
 
 
 64
 No action shall be maintained to enforce any liability created under section [12(2) ] under this title unless brought within one year after the discovery of the untrue statement ... or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any action be brought ... more than three years after the ... sale [of the security].
 
 
 65
 15 U.S.C. § 77m. Compliance with section 13's requirements is an essential element of the right created under section 12(2); compliance is a substantive rather than a procedural requirement. See McMerty v. Burtness, 72 F.R.D. 450, 453 (D.Minn.1976).
 
 
 66
 Section 13 requires reasonable diligence, that is, an action must be commenced within one year after the investor either knew or should have known of the false or misleading communication.[8] The one-year limitations period "does not 'commence only when a plaintiff has full knowledge of the existence of a claim. On the contrary, [it] begins to run even when a plaintiff is placed on 'inquiry notice' of possible misrepresentations.' " Anixter v. Home-Stake Prod. Co., 939 F.2d 1420, 1437, amended by, 947 F.2d 897 (10th Cir.1991) (quoting DeBruyne v. Equitable Life Assurance Soc'y of the U.S., 920 F.2d 457, 466 (7th Cir.1990)). The First Circuit, in Cook v. Avien, Inc., 573 F.2d 685 (1st Cir.1978), has referred to the circumstances constituting " 'inquiry notice' " as "storm warnings" such that a reasonable person would be alerted to the possibility of material omissions or misleading information provided. See id. at 696-97. Thus, a plaintiff "may not ignore 'storm warnings' which would alert a reasonable investor to the possibility of fraud." Hirschler v. GMD Investments Ltd. Partnership, Fed.Sec.L.Rep. p 95,919, at 99,563, 1991 WL 115773 (E.D.Va.1991).
 
 
 67
 "Whether a plaintiff is on notice of the possibility of fraud is an objective question amenable to summary judgment. The Court must determine whether the plaintiff 'possessed such knowledge as would alert a reasonable investor to the possibility of fraud.' Whether a plaintiff has exercised due diligence, however, is a more subjective inquiry." Id. (quoting Davis v. Birr, Wilson & Co., 839 F.2d 1369, 1370 (9th Cir.1988)) (citations omitted).
 
 
 68
 In the case before this Court, appellants concede that they each received a Schedule K-1 in March of 1988. As discussed in greater detail supra, each K-1 showed a substantial discrepancy between the amounts promised and those actually received, either with respect to the tax loss or the cash distribution, or--in the case of Roth--both. Nevertheless, neither appellant claims any kind of continuing concealment of the true facts after June 1987 at the latest. Appellants did not bring this action until May 1989.
 
 
 69
 A successful plaintiff must show both fraudulent concealment by the defendants and plaintiff's own due diligence in order to toll the section 13 limitations period. See Hirschler, p 95,919, at 99,558. In this case, the record contains no proffer by appellants of either. Therefore, the district court properly dismissed appellants' claim under section 12(2).
 
 
 70
 In sum, for the reasons stated in this opinion, the two Opinions and Orders of the District Court are
 
 
 71
 AFFIRMED.
 
 
 
 *
 The HONORABLE FRANK A. KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 Nevertheless, at some point Davidson did sign an investor questionnaire in which he indicated that he was a sophisticated, experienced investor, and that he was not in need of a purchaser representative to assist him in weighing the risks and benefits of investing in Wilcap. Roth--see details set forth in this opinion, infra--also signed such an investor questionnaire in which he made similar representations
 
 
 [2]
 The WCI Confidential Offering Memorandum, which is repeatedly referenced in the Subscription Agreement and which Roth admits that he received prior to investing in Wilcap, and which one of Davidson's advisors received in the Fall of 1985, states in part:
 FINANCIAL FORECASTS AND PROJECTIONS ARE CONTAINED IN THE FINANCIAL EXHIBIT INCLUDED AS EXHIBIT A TO THIS CONFIDENTIAL MEMORANDUM (THE "FINANCIAL EXHIBIT") AND IN THE SALES MATERIALS ACCOMPANYING THIS CONFIDENTIAL MEMORANDUM. ANY PREDICTIONS AND REPRESENTATIONS, WRITTEN OR ORAL, WHICH DO NOT CONFORM TO THOSE CONTAINED IN THE CONFIDENTIAL MEMORANDUM OR THE SALES MATERIALS, ARE PROHIBITED. INVESTORS AGREE TO ADVISE THE INVESTOR PARTNERSHIP IN WRITING IF THEY ARE RELYING ON ANY SUCH INFORMATION. NO REPRESENTATIONS AS TO THE FUTURE ACCURACY OR COMPLETENESS OF THE FINANCIAL FORECASTS OR PROJECTIONS IS MADE.
 ....
 NO DEALER, SALESMAN OR OTHER PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION IN CONNECTION WITH THIS OFFERING OTHER THAN AS AUTHORIZED IN THE CONFIDENTIAL MEMORANDUM OR IN THE EXHIBITS HERETO AND, IF ANY SUCH INFORMATION OR REPRESENTATION IS GIVEN, IT MUST NOT BE RELIED UPON.
 Joint Appendix at 59-60 (upper case lettering in original).
 
 
 [3]
 The court below did not dismiss appellants' common law fraud claim, finding that it met the pleading requirements of Fed.R.Civ.P. 9(b). The court also did not dismiss appellants' RICO claims because discovery had not been completed to enable appellants to demonstrate the required pattern of conduct. The court dismissed the breach of fiduciary duty claims, ruling that appellants had failed to show that any of the appellees were fiduciaries to appellants at the time of the alleged misrepresentations. Appellants are not pressing these latter two claims in this appeal
 
 
 [4]
 The court below also granted summary judgment on appellants' RICO claims; however, appellants do not question that ruling in this appeal
 
 
 [5]
 Appellants have stated in their briefs filed in connection with this appeal that they received only one page, the signature page, of the Subscription Agreement--and received that only after they had purchased their partnership units--together with a covering letter which did not describe what the document was. Nevertheless, appellants--both self-acknowledged sophisticated investors--proceeded to sign the bare signature page, not knowing what it was for, and to return it to Winthrop Financial. However, in the court below, appellants stated only that they received the "Subscription Agreement" prior to the time they made their purchase. There is no indication in the record that appellants asserted in the court below that they received only a portion of it or, more particularly, only one page. Accordingly, that specific contention is not appropriately before us in this appeal
 
 
 [6]
 In Zobrist,
 [t]he trial court ... instructed the jury that the test to be applied was whether the plaintiff's reliance was justified; that he did not intentionally close his eyes and refuse to investigate, concerning the circumstances, in disregard of a risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.
 Id. at 1517.
 
 
 [7]
 In the district court, Davidson and Roth both relied upon the fact that Winthrop Financial was a general partner of Wilcap and, as such, owed a fiduciary duty to Davidson and Roth as limited partners. However, the claimed misrepresentations were made prior to the time they became partners. Thus, the district court concluded that the appellees were not fiduciaries with respect to Davidson and Roth at the time of the alleged misrepresentations
 
 
 [8]
 In addition, compliance with section 13 must be pled with specificity. Because the timeliness requirement is substantive, "a plaintiff must affirmatively plead facts indicating the action has been timely brought." Hagert, 520 F.Supp. at 1033 (citations omitted). Here, Davidson and Roth have failed to plead the actual date of purchase of their investments, the time and circumstances of the discovery of the alleged fraudulent statements, and the reasons why discovery was not made earlier
 As Judge Latchum, in the United States District Court for the District of Delaware, has stated,
 [I]n order properly to allege a claim under § 12(2), the complaint must set forth the time and circumstances of the discovery of the fraudulent statements, the reasons why discovery was not made earlier if more than one year has elapsed since the fraudulent conduct occurred, and the diligent efforts which plaintiff undertook in making or seeking such discovery.
 Hill v. Der, 521 F.Supp. 1370, 1389 (D.Del.1981) (citations omitted).