# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1609

_____

Bruce K. Ritchey; Marty V. Crawford,

      Appellants,

     v.

William L. Horner, Jr.; Eloise S. Horner,

      Appellees.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
Eastern District of Arkansas.

_____

Submitted: December 11, 2000
Filed: March 26, 2001

_____

Before WOLLMAN, Chief Judge, RICHARD S. ARNOLD, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Plaintiffs Bruce Ritchey and Marty Crawford filed suit, alleging that William Horner and his mother, Eloise Horner, committed violations of federal and state securities laws when they sold their building supply business to plaintiffs. The district court granted summary judgment on the federal claim in favor of the Horners, concluding that it was time-barred, and declined jurisdiction over the supplemental state law claims. Plaintiffs appeal, and we reverse.

I.

On September 22, 1997, Ritchey and Crawford met with the Horners to finalize their purchase of the Horners' family-owned corporation, the Mississippi County Lumber Company. Ritchey had worked as a truck driver and salesperson for the company from 1980 to 1985. He then left the company but rejoined it again in 1991 and was employed as its manager until the time of the purchase. Crawford was not employed by the company but had done business with Jack Horner since 1994 in relation to his home improvement business. At the meeting, the parties executed a written agreement in which Ritchey and Crawford agreed to purchase the Horners' interest in the corporation. In the agreement, the Horners warranted that the corporation had filed all tax returns required by law, that the returns had been timely filed, and that the corporation had no outstanding tax liabilities.

Ritchey and Crawford were apparently concerned about the company's tax returns and tax liabilities because Ritchey knew that the company had received a proposed tax assessment from the State of Arkansas for the 1994 and 1995 tax years. The notice indicated that the assessed tax was due on July 26, 1997. Jack Horner, however, assured Ritchey sometime prior to the meeting that the company did not actually owe taxes for the two years and that the company received the notice only because its accounting firm, Deitz & Associates (Deitz), had not yet filed the tax returns for those years.[1] Jack Horner also directed Deitz to fax a May 31, 1997, company financial statement to plaintiffs, which they received on September 10. The statement did not reflect any outstanding tax liabilities. At the meeting itself, Jack

[1]The record contains a September 21, 1997, letter from Deitz to the Arkansas Department of Finance and Administration, explaining in response to the proposed assessment that the company had no taxable income for 1994 and 1995 once operating expenses and loss carryforwards were taken into consideration. Oddly, the letter claims that the firm would complete and file the required returns by September 15, 1997. In an affidavit, Ritchey asserts that he never saw the letter.

Horner specifically stated that the corporation's 1995 and 1996 federal and state income tax returns had been filed but that he would have to send them to Ritchey and Crawford later because the returns were in Deitz's possession. Although the record is not clear as to why, plaintiffs were apparently no longer concerned about the 1994 tax returns at the time of the September meeting.

After the September 22 meeting, Ritchey and Crawford were told by their own accountant that there were advantageous tax reasons to restructure the purchase of the company. As a consequence, the Horners and the corporation entered into a stock repurchase agreement on October 20, 1997, in which the corporation agreed to pay the Horners $250,000 for their shares; $50,000 as a down payment and the remaining balance, plus interest, in installments over 59 months. Ritchey and Crawford, in turn, each contributed approximately $1500 to the corporation and furnished the down payment to the Horners on behalf of the corporation. They also personally guaranteed the corporation's debt to the Horners, and, in exchange, the corporation issued one share to each. As part of the deal, the Horners requested that $5000 of the down payment be paid directly to Deitz for its accounting work. The stock repurchase agreement provided that the Horners would remain on the company's board for life and that Jack Horner would have the right to review and approve any distributions or salaries paid by the corporation to its officers or employees until such time as the corporation repaid its debt to the Horners.

Ritchey and Crawford asked Jack Horner on numerous occasions after the September meeting why they had not yet received the 1995 and 1996 tax returns from Deitz. On at least one occasion, Horner explained that the delay was caused by some confusion or dispute over some accounting charges that he and his mother owed to Deitz for personal work performed for him and his mother. On the other occasions, he told them that the returns would be coming soon and that he needed to "get with" his accountant about getting the returns. Plaintiffs never verified whether the returns had in fact been filed, believing it better to let Jack Horner resolve the matter because he

had dealt with the firm in the past. Following the purchase, plaintiffs no longer employed Deitz to perform its accounting work.

Despite Horner's repeated promises to resolve the tax return problem, Ritchey received a letter from Deitz on June 12, 1998, which explained that the company's 1995 and 1996 tax returns had not been completed or filed because the company had failed to pay the firm for its past services.[2] Approximately one month later, Ritchey and Crawford received a notice from the State of Arkansas assessing the company's 1995 tax liability, including penalty and interest, at $26,968.95, and seeking immediate payment. After attempts to resolve the tax liability with the Horners failed, plaintiffs brought suit on April 19, 1999, asserting that the Horners engaged in securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, based on their representations that the company's tax returns had been filed and that the company owed no outstanding taxes. The Horners then filed a motion to dismiss, which the district court treated as one for summary judgment because the parties relied on matters outside the pleadings, arguing that the securities fraud claim was not brought within the applicable one-year statute of limitations. In ruling on the motion, the district court found as a matter of law that plaintiffs had inquiry notice of the alleged problems with the company's tax returns by, at latest, February 1998, more than one year before the suit was filed.

II.

The time period in which an aggrieved party must bring an implied private cause of action under § 10(b) and Rule 10b-5 is governed by § 13 of the Securities Act of

---

[2]According to the letter, the company had failed to pay accounting charges dating back to 1991. As of the end of 1993, the company owed the accounting firm $23,860.37, although Jack Horner made a payment of $7,500 on the company's account in August 1997. Strangely enough, the financial statement prepared by Deitz did not reflect a liability for previous accounting services.

1933, 15 U.S.C. § 77m (Supp. IV 1998). Great Rivers Coop. of S.E. Iowa v. Farmland Indus., 120 F.3d 893, 896 (8th Cir. 1997) (citing Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 361 (1991)). Section 13 provides, as relevant here, that the action must be brought within one year after the discovery of the alleged misrepresentation or "after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The reasonable diligence standard is an objective one, commonly referred to as the doctrine of "inquiry notice," because the one-year limitations period may be triggered even though the victim is unaware of the misleading statements if, in exercising reasonable diligence, he should have discovered their misleading nature. See Great Rivers, 120 F.3d at 896. We have said before that "inquiry notice exists when there are 'storm warnings' that would alert a reasonable person of the possibility of misleading information, relayed either by an act or by omission." Id. (quoting Davidson v. Wilson, 973 F.2d 1391, 1402 (8th Cir. 1992)). Because plaintiffs' alleged failure to file suit within the period prescribed by § 13 is an affirmative defense, the Horners bear the burden of establishing it. See Law v. Medco Research, Inc., 113 F.3d 781, 786 (7th Cir. 1997); cf. Schmidt v. United States, 933 F.2d 639, 640 (8th Cir. 1991) (recognizing that statute of limitations is an affirmative defense that defendant bears the burden to prove). Thus, the issue is whether defendants have shown that there is no genuine dispute of fact that plaintiffs were on inquiry notice that the returns had not been filed sometime before April 19, 1998.

In deciding this issue, the district court reasoned that Jack Horner's "unconvincing excuses" as to why Ritchey and Crawford had not received the company's tax returns constituted red flags that should have led Ritchey and Crawford, by February 1998 at the very latest, to verify whether the returns had in fact been filed. We review the district court's decision de novo, and we uphold summary judgment only if we find that no genuine issues of material fact remain and that the Horners are entitled to judgment as a matter of law. Concerned Irrigators v. Belle Fourche Irrigation Dist., 235 F.3d 1139, 1143 (8th Cir. 2001). In determining the existence of

5

any genuine issues of material fact, we view the record most favorably to plaintiffs, the nonmoving parties.  Id.

Plaintiffs argue that the record does not support the district court's finding as a matter of law that they were on inquiry notice of the company's tax problems for more than a year before they filed suit.  In particular, they contend the district court failed to take into account their long-standing relationship with Jack Horner in characterizing his excuses as unconvincing.  Their position, in contrast, is that they had no reason to disbelieve what Jack Horner had been telling them all along until they received the June 12, 1998, letter from Deitz.  In resolving plaintiffs' arguments, we are guided by Great Rivers' statement that there are three determinations a court must make in ascertaining whether the inquiry notice standard has been satisfied: "(1) the facts of which the victim was aware; (2) whether a reasonable person with knowledge of those facts would have investigated the situation further; and (3) upon investigation, whether the reasonable person would have acquired actual notice of the defendant's misrepresentations."  120 F.3d at 896.

We begin with the relevant facts known to plaintiffs in deciding whether, or when, they were on inquiry notice of the problems.  Ritchey and Crawford concede that they were aware in July 1997 that tax returns had not been filed and that a proposed assessment was pending, and due, before the first contract was executed in September 1997.  They emphasize, however, that Jack Horner told Ritchey that the prepurchase tax assessment was received only because the corporation's returns had not been filed by Deitz and, further, that no tax was actually owed.

At the September meeting, plaintiffs again received assurances from Jack Horner that all the corporation's returns were filed and that the company had no outstanding tax

liability.[3] When they did not receive the returns after the September meeting, Horner explained that the returns had been filed but that Deitz refused to provide them because of some confusion over unpaid accounting charges. The details as to what he told plaintiffs and when he told them are not clear from the record. Viewing the record in plaintiffs' favor, though, it appears that Horner informed them early on that he and his mother owed the firm for some personal accounting work, work unrelated to company business, and that once he resolved the confusion, Deitz would provide the returns. Through June of 1998, Jack Horner continued to tell plaintiffs that he would resolve the matter with Deitz and that he would get the returns.

Plaintiffs contend, for several reasons, that they did not become suspicious of Horner when he told them the returns had been filed or when he failed after numerous requests to resolve the billing problem. First, the financial statement, prepared and faxed to plaintiffs by Deitz, did not identify any company liability for outstanding taxes nor did it indicate that the company owed Deitz. Second, as part of their purchase of the company, plaintiffs paid $5000 directly to the accounting firm, which, because of the billing confusion, permitted them to believe that Deitz had completed the 1995 and 1996 returns and that the firm's charges for those services had been paid in full. Finally, both Ritchey and Crawford describe Jack Horner as being either absent-minded or a procrastinator and explain that, based on their past experiences with him, he often failed to do what he said he was going to do. Despite his tendency to procrastinate, though, they assert that they had total faith in his statement that the returns had been completed because he had never been dishonest or deceptive with them in the past.

---

[3]Defendants insinuate that Ritchey had to be aware that the tax returns had not been filed because he was the "manager" of Mississippi County Lumber. In his affidavit, however, Ritchey states that Jack Horner and the company's bookkeeper handled the company's financial matters prior to the purchase, including preparation of the tax returns.

The question next becomes whether the fact that plaintiffs did not receive the returns after the purchase was completed, and Jack Horner's explanation and repeated assurances that he would resolve the problem, would have alerted a reasonable person to the possibility that the returns had not been filed. We conclude that this inquiry is far too factual to be resolved at the summary judgment stage. Courts, including our own, that have found facts sufficient as a matter of law to alert a reasonable investor of the possibility of a misrepresentation have generally done so when the record contains evidence that plaintiffs received information directly contrary to the complained-of misrepresentation. See, e.g., Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 129 F.3d 222, 224-25 (1st Cir. 1997) (concluding duty to investigate triggered where high interest rates, coupled with drastic short-term decline in value, provided inquiry notice that investment was not low-risk, safe and non-speculative, as described); Great Rivers, 120 F.3d at 897-98 (finding inquiry notice as a matter of law where article stated that capital credits would be redeemed at about 5% annually, and that redemption was wholly discretionary, which was contrary to alleged misrepresentation that credits could be redeemed within one to two years); Davidson v. Wilson, 973 F.2d 1391, 1402-03 (8th Cir. 1992) (finding inquiry notice on summary judgment where plaintiffs received a Schedule K-1 showing a substantial discrepancy in the allocation of partnership tax losses and cash distributions from those promised). Here, the record contains no evidence (that is until June 1998) that plaintiffs received or had access to any information contrary to Jack Horner's assertions that the returns had been filed. Instead, the crux of defendants' argument in support of summary judgment is that plaintiffs should have become suspicious enough to verify that the returns had been filed because Jack Horner continued to assure them that they had been filed but failed to produce the returns.

But the facts relied upon to support inquiry notice must rise to a level of more than mere suspicion; they must instead be "sufficiently confirmed or substantiated" to a point at which the victims are incited to investigate. Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1335 (7th Cir. 1997). From an outsider's view it seems that plaintiffs

8

should have been leery of Jack Horner's repeated assurances, but we must look at the information available to the victims before that judgment is made, which includes what the two knew about Jack Horner based on their past experiences with him. According to their affidavits, plaintiffs both knew and trusted Jack Horner. Both had done business with him or worked for him previously, and neither had ever known him to be deceitful. In addition, the structure of plaintiffs' purchase of the company appears to reflect great trust, even mentorship, in the relationship; Jack Horner remained a member of the corporation's board (for life), he approved plaintiffs' salaries, and both he and his mother continued to have a financial stake in the company, i.e., the remaining debt owed to them by the corporation. Based on their past experiences with him, plaintiffs also assert that Horner often procrastinated. What effect the relationship may have had on how plaintiffs viewed what Jack Horner told them cannot be adequately adjudged on summary judgment. Consequently, we cannot say as a matter of law that Jack Horner's statements were "unconvincing" and that plaintiffs should have been led to investigate.

We also find it odd that the record contains no evidence of any correspondence between Deitz and plaintiffs until the June 12 letter. Deitz was presumably aware that plaintiffs purchased the company, and the firm was obviously aware that tax returns needed to be filed, but it took nearly eight months to notify plaintiffs that there was a problem. The accounting firm also prepared the financial statement which failed to show any liability for accounting charges or unpaid taxes. Moreover, plaintiffs received no further assessment from the state. Given these facts, and that plaintiffs were aware that a proposed assessment was due prior to their purchase of the company, a fact finder could certainly conclude that Jack Horner's claims that the returns had been filed were bolstered by the fact that plaintiffs heard nothing further about the tax returns from the accountants or the State. Having thoroughly reviewed the record, we conclude that the evidence is not such that no rational trier of fact could find in favor of plaintiffs on whether they were on inquiry notice before April 19, 1998. See Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999) ("Summary judgment is

to be granted only where evidence is such that no reasonable jury could return a verdict for the nonmoving party.").

## III.

Accordingly, we reverse the district court's grant of summary judgment and remand plaintiffs' federal claim for further proceedings not inconsistent with this opinion. Because the dismissal of plaintiffs' state law claims was premised upon the adverse grant of summary judgment leaving no federal claim to try, we reverse that decision as well and direct the district court upon remand to resume jurisdiction over the state law claims.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.