**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEIDE BETZ,

*Plaintiff-Appellant,*

v.

TRAINER WORTHAM & COMPANY, INC.; DAVID P. COMO; FIRST REPUBLIC BANK, a Nevada corporation; ROBERT VILE,

*Defendants-Appellees.*

No. 05-15704

D.C. No.
CV-03-03231-SI

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
February 12, 2007—San Francisco, California

Filed October 4, 2007
Amended February 26, 2008

Before: John T. Noonan, Jr., Ronald M. Gould, and
Johnnie B. Rawlinson, Circuit Judges.

Order;
Dissent to Order by Chief Judge Kozinski
Opinion by Judge Gould

## COUNSEL

Joseph M. Alioto, San Francisco, California, Theodore F. Schwartz, St. Louis, Missouri, and Myron Moskovitz, Berkeley, California, for the plaintiff-appellant.

Sara B. Brody and Alexander M.R. Lyon, Heller Ehrman, LLP, San Francisco, California, for the defendants-appellees.

**ORDER**

The opinion filed on October 4, 2007 is amended as follows.

The last sentence of the second paragraph in Part I, which reads:

> Betz told Como and Castro that she knew nothing about stocks and bonds and that she only would understand the "bottom line," or total balance, of her account.

shall be deleted in its entirety.

In addition, the second and third sentences of footnote 4, which currently read:

> In *Davis v. Birr, Wilson & Co.*, 839 F.2d 1369 (9th Cir.1988), for example, we concluded that summary judgment on the issue of notice was proper because the plaintiff was a well-educated and experienced investor who made suggestions to his broker about his portfolio and who described himself as a "sophisticated investor." *Id.* at 1370. By contrast, Betz had informed the defendants that she had no experience with stocks or bonds and would only understand the bottom line of her account statements, and thereafter, if we credit Betz's testimony, received specific assurances from the president of Trainer Wortham that her account problems would be resolved and that she should forego suit.

shall be deleted and replaced with the following text:

> For example, in *Davis v. Birr, Wilson & Co.*, 839 F.2d 1369 (9th Cir. 1988) (per curiam), a case predating our adoption of the inquiry-plus-reasonable-

diligence standard for inquiry notice in federal securities fraud cases, we concluded that summary judgment on the issue of notice was proper where the plaintiff took an active role in the management of his investments and made suggestions to his broker about his portfolio. *See id.* at 1370. By contrast, Betz merely expressed generalized concerns about her declining account balance, in response to which, if we credit Betz's testimony, she received specific assurances from the president of Trainer Wortham that her account problems would be resolved and that she should forego suit. No such evidence of assurances from the highest levels of the defendant securities firm was present in *Davis*.

Having made the foregoing amendments to the opinion, all judges on the panel have voted to deny Defendant/Appellee's Petition for Panel Rehearing, and so that petition is DENIED.

The full court has been advised of Defendant/Appellee's Petition for Rehearing En Banc, and a judge of this court requested a vote on whether this case should be reheard en banc; however, a majority of the active judges did not vote in favor of en banc consideration. Fed. R. App. P. 35. Accordingly, the Petition for Rehearing En Banc is also DENIED. No further petitions for rehearing or rehearing en banc shall be accepted.

---

KOZINSKI, Chief Judge, with whom Judges O'SCANNLAIN and BEA join, dissenting from the order denying the petition for rehearing en banc:

Here we are, out in left field again. The panel's unique interpretation of the statute of limitations for securities fraud puts us at odds with ten other circuits.

This isn't one of those byzantine securities cases involving risk-indexed convertible debentures or rupee-denominated strip bonds; there was no Gibbon-length, fine-print prospectus artfully concealing liabilities. Betz claims, rather, that defendant induced her to invest $2.2 million by promising a princely return with zero risk. Slip op. at 1656-1657. This purported oral promise—which flatly contradicts Betz's written contract and common sense—is her sole theory of fraud. If a securities defendant in a simple case like this cannot use the statute of limitations as a shield against the costs and hazards of trial, then no defendant can, and the statute of limitations Congress passed for 10b-5 cases is pretty much a dead letter in this circuit.

Betz found out that her investment wasn't risk-free after all by February 2000, when she received an account statement from the bank showing a balance $170,000 lower than her initial investment. How could a risk-free investment result in such a massive loss of principal? Doesn't risk-free mean that the principal will never diminish? Betz admits that she read the statement and grasped the "bottom line." *Id.* Thereafter, her principal steadily dwindled; she received 29 more account statements charting its inexorable decline. One would think that a sane, rational, *reasonable* investor who discovered that her principal was fast disappearing after she had been promised that it would not be "touch[ed]," *id.*, would suspect that someone lied to her. Yet Betz waited three and a half years to bring suit—nearly double the time Congress allowed. 28 U.S.C. § 1658(b)(1).

The panel keeps Betz's lawsuit alive by invoking the mantra of material issues of fact that only a jury can decide. Slip op. at 1669. But there's no factual dispute here; everyone agrees on what Betz knew and when she knew it. The only question is whether those facts were enough to put a reasonable investor on inquiry notice. *See* p.1647 *infra*. *Ten* other circuits have held that "inquiry notice . . . . may be determined as a matter of law where, as here, the underlying facts are

admitted or undisputed." *Maggio* v. *Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir. 1987).[1] Paddling stubbornly against the current, the panel insists that only a jury can decide.[2]

But there's more, so much more. According to the same ten circuits, the statute of limitations starts to run when plaintiff is on "inquiry notice," that is, when a reasonable investor in plaintiff's position would suspect he had been defrauded. *See, e.g.*, *Sterlin* v. *Biomune Sys.*, 154 F.3d 1191, 1201-02 & n.19 (10th Cir. 1998). The panel pretends to adopt this standard, but rejects it in fact. Since Betz's theory of fraud is that she was told her money would not be put at risk, she had *at least* inquiry notice that someone had lied to her when she saw her principal melt away like a popsicle in July. The appendix tells the tale in Betz's own hand: It is her account statement from January 2001, showing a balance that was by then nearly $1 million below her initial investment. Scribbled in the margin are Betz's notes describing a "panic[ked]" phone call to her

---

[1]Four other circuits make the point in equally direct terms. *See Mathews* v. *Kidder, Peabody & Co.*, 260 F.3d 239, 250 n.13 (3d Cir. 2001); *Great Rivers Coop. of Se. Iowa* v. *Farmland Indus., Inc.*, 120 F.3d 893, 896 (8th Cir. 1997); *Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 352 n.3 (2d Cir. 1993); *Brumbaugh* v. *Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993). Another five circuits, though not stating the rule in so many words, have acted on it by holding, as a matter of law, that the statute has run. *See Wyser-Pratte Mgmt. Co.* v. *Telxon Corp.*, 413 F.3d 553 (6th Cir. 2005) (dismissing complaint on statute-of-limitations grounds); *Theoharous* v. *Fong*, 256 F.3d 1219 (11th Cir. 2001) (same); *Treganza* v. *Great Am. Commc'ns Co.*, 12 F.3d 717 (7th Cir. 1993) (granting summary judgment on statute-of-limitations grounds); *Topalian* v. *Ehrman*, 954 F.2d 1125 (5th Cir. 1992) (same); *Anixter* v. *Home-Stake Prod. Co.*, 939 F.2d 1420, 1441-42 (10th Cir.), *amended on denial of reh'g*, 947 F.2d 897 (10th Cir. 1991), *vacated sub nom. Dennler* v. *Trippet*, 503 U.S. 978 (1992) (same).

[2]The panel protests that it hasn't adopted a "*per se* rule that in all cases . . . the issue of inquiry notice must go to a jury," slip op. at 1670, but that's *exactly* the rule the panel adopts. Inquiry notice depends on what a reasonable investor would have done; the panel holds that only a jury can decide what's reasonable. There is nothing to distinguish this case from any other; summary judgment simply doesn't exist in the world the panel has created.

account manager complaining about her losses. Though the opinion doesn't acknowledge this particular inquiry, it does mention a similar call Betz placed to the same manager two months later. Slip op. at 1657. Betz made these inquiries (and several others like them) more than two years before she sued in July 2003; so, to save her from the statute of limitations, the panel must adopt a bizarre definition of inquiry notice: Notice that *actually* causes the investor to make inquiries is nevertheless insufficient to put a reasonable investor on notice to make inquiries. No other court in the known universe has adopted such an oxymoronic rule.

Five other circuits have dealt with cases where investors claimed they were hoodwinked by promises that their dollars would multiply like bunnies with absolutely no risk. All five held that the statute of limitations was triggered as soon as the investors found out they lost money, if not before. The First and Third Circuits held that sharply declining balances put investors on notice that the promised lack of risk was a lie. *Mathews* v. *Kidder, Peabody & Co.*, 260 F.3d 239, 254 (3d Cir. 2001) (Nygaard, J.); *Cooperativa de Ahorro y Credito Aguada* v. *Kidder, Peabody & Co.*, 129 F.3d 222, 224 (1st Cir. 1997) (Boudin, J.). Had Betz lived in Boston or Philadelphia, she would have been on inquiry notice by January 2001, at the very latest: By then, her account had lost about half its value, and the bank had confirmed that those losses were real. The Second, Fourth and Fifth Circuits have held that investors in Betz's position are on inquiry notice even earlier—as soon as they are handed documents warning them that their investments would be riskier than promised. *Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993) (Winter, J.); *Brumbaugh* v. *Princeton Partners*, 985 F.2d 157, 163 (4th Cir. 1993) (Wilkinson, J.); *Topalian* v. *Ehrman*, 954 F.2d 1125, 1134 (5th Cir. 1992) (Garza, J.). Had Betz lived in New York, Baltimore or Houston, she would have been on inquiry notice as soon as she opened her account and received the bank's "Letter of Understanding," which told her, in contradiction to the

alleged oral promise, that her investment was "subject to investment risk and a possible loss of principal."

In reaching the contrary conclusion, the panel holds that Betz couldn't be on inquiry notice until she had solid proof of every single element of her 10b-5 claim, including scienter. Slip op. at 1669. And, without more proof of scienter, the panel opines, a reasonable investor in Betz's position would have believed that the bank really did mean to put the money into 30-day T-bills, but somehow got confused and bought volatile stocks instead. According to the panel, it wouldn't have crossed a reasonable investor's mind that the bank lied when it promised a risk-free investment until June 2002, when Betz had lost about four-fifths of her principal and the bank refused to make good her losses. *See* slip op. at 1657.[3] The argument does serious violence to "reasonable investor" and "inquiry notice."

The panel cites no authority supporting its curious notion that an investor isn't on inquiry notice until he has concrete proof of every element of his claim, including scienter. There *is* no such authority; ten circuits disagree. Tellingly, the only on-point case the panel cites,[4] *Fujisawa Pharmaceutical Co.*

---

[3]The panel doesn't explain what's so special about June 2002, except that it's less than two years before Betz brought suit. Betz certainly learned nothing new then about what the bank's state of mind was at the time she opened her account. The panel seems to attribute some significance to the fact that in June 2002 the bank refused to make good Betz's losses. But what does that have to do with scienter or Betz's theory of liability?

[4]The panel also cites two of our cases that stand for the unremarkable proposition that falling stock prices alone do not always put plaintiffs on inquiry notice of fraud. *Livid Holdings Ltd.* v. *Salomon Smith Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005); *Gray* v. *First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996). Those cases aren't relevant to the question of whether plaintiff must always have proof of scienter to trigger the statute of limitations, because the fraud there was a misrepresentation about the value of the underlying asset. A falling share price is, at best, only indirect evidence of such fraud. Here, by contrast, the falling price was direct—and incontrovertible—proof that the investment was riskier than allegedly promised.

v. *Kapoor*, 115 F.3d 1332 (7th Cir. 1997) (Posner, C.J.), holds just the opposite. *Fujisawa* considered the panel's position:

> [Plaintiff] contends that the statute of limitations doesn't begin to run until the victim has in hand *all* the facts he needs in order to bring suit immediately . . . .

*Id.* at 1334. But unlike our panel, the Seventh Circuit saw the obvious problem with this approach: If the statute doesn't start to run until plaintiff has proof of every element of his claim, plaintiff has no incentive to bring suit promptly. Instead, he will often prefer a "wait-and-see" approach:

> On this view, the potential plaintiff can complete his investigation, draft his complaint, and put the complaint in a drawer to be taken out in a year and filed if the price of the stock has fallen.

*Id.*

Such delay is unfair to defendants, as the Fourth Circuit recognized in a similar case. While plaintiff is waiting to see whether his investment recovers on its own, defendant "loses the security of knowing when legal action against him has been foreclosed." *Brumbaugh*, 985 F.2d at 162. Plaintiff, by contrast, gets the benefit of a "heads I win, tails you lose" bet: If the investment goes up, he reaps the profit; if it goes down, he gets to recover his losses in court. Worse still, plaintiff's delay may prejudice defendant's case as "[m]emories fade, documents are lost, [and] witnesses become unavailable." *Id.* If plaintiff spins out the statute of limitations long enough, he may be able to "coerce settlement[ ] simply because aging has improved an originally meritless claim." *Id.* After this opinion, we might as well rename the PSLRA in the Ninth Circuit as the SPLFEA (Securities Plaintiffs Lawyers' Full Employment Act).

For all those reasons, every other circuit to consider the issue has followed the rule explained in *Brumbaugh* and *Fujisawa*: "[T]he facts that put the victim of the fraud on notice can fall short of actual proof of fraud." *Fujisawa*, 115 F.3d at 1335. Five other circuits state the point just as bluntly. *See Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 564 (6th Cir. 2005) (plaintiff "may not delay the commencement of the statute of limitations until after it has secured direct evidence of [defendant's] culpability"); *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1283 (11th Cir. 2005) ("[i]nquiry notice is triggered by evidence of the *possibility* of fraud," not "[f]ull exposition of the scam" itself (internal quotation marks omitted)); *Sterlin*, 154 F.3d at 1203; *Dodds*, 12 F.3d at 352 ("An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice."); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987).

Other circuits express the same idea by analogizing inquiry notice to "storm warnings"—hints that something may be amiss so that the investor needs to start asking some hard questions. A plaintiff has storm warnings—and is therefore on inquiry notice—long before the storm itself is upon him. Where, as here, an investor is promised a certain return on a risk-free investment, but instead loses money by the bushel, the losses are storm warnings that the promise may have been a lie. *See Sudo Props., Inc. v. Terrebonne Parish Consol. Gov't*, 503 F.3d 371, 377 (5th Cir. 2007) (decline in value of plaintiff's investment is a "storm warning" putting plaintiff on notice that defendant's promises were lies); *Mathews*, 260 F.3d at 252 ("storm warnings" include "information . . . that conflicts with representations that were made when the securities were originally purchased"); *Davidson v. Wilson*, 973 F.2d 1391, 1402 (8th Cir. 1992) ("storm warnings" include reports from defendants showing "a substantial discrepancy between the amounts promised and those actually received"). We are the only circuit to hold that plaintiff has no storm warnings until the hurricane makes landfall.

The panel makes matters even worse by throwing a second pipe wrench into the machinery of the statute of limitations. As an alternative ground, the panel holds that, even if Betz was on inquiry notice of possible fraud—and thus had a duty to inquire—the bank thwarted her inquiries by giving her "assurances" that her fortunes would improve. Slip op. at 1669. Because of those assurances, the panel tells us, a reasonable investor in Betz's position just couldn't have figured out that the bank had lied and therefore would have had no grounds for filing suit. That's truly what they say; check it out. *Id.*

There is a handful of cases where a defendant's outright lies and malfeasances prevented an investor who made diligent inquiries from discovering *facts known only to the defendant*. In such cases, courts have held that the statute wasn't triggered. For instance, the panel cites *SEC* v. *Seaboard Corp.*, 677 F.2d 1301 (9th Cir. 1982), where plaintiff claimed he asked defendant tough questions about facts that were in defendant's exclusive possession, and defendant responded by lying about those facts. As a result, plaintiff held off suing. *Id.* at 1309-10. Applying a pre-*Celotex* standard,[5] we held that there was a factual dispute as to whether plaintiff could have discovered those facts on his own. *Id.*; *see also, e.g.*, *Marks* v. *CDW Computer Ctrs., Inc.*, 122 F.3d 363, 365-66 (7th Cir. 1997) (plaintiff inquired about fraud but defendant lied and refused to allow plaintiff to inspect the company's books).

But ours is not a case where defendant thwarted plaintiff from developing the facts. Indeed, Betz doesn't claim that the bank misrepresented any *facts*. The bank did not, for example,

---

[5]Four years after we decided *Seaboard*, the Supreme Court revised the standard for summary judgment in *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). Along with two other cases decided that Term, *Celotex* "signal[ed] to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles Alan Wright et al., Federal Practice and Procedure § 2727 (3d ed. 1998). It's unclear how *Seaboard* would come out in a post-*Celotex* world.

tell Betz that she still had 100 percent of her principal, even though the statements didn't show it. Quite the opposite: The bank *confirmed* that Betz's principal was gone. The bank did predict she would get her money back when the stock market recovered, but such a statement only confirms that plaintiff's investment is subject to market fluctuations and is therefore *not* free from risk. A defendant who conceals facts may conceivably prevent a reasonably diligent investor from discovering the truth, but a defendant who jollies a disappointed investor along with sunny forecasts of future bull markets conceals nothing and thus does not prevent the investor from gathering enough information to bring suit.

The panel's alternate ruling is as bad as the first, perhaps worse. One wonders what a securities defendant could say to an unhappy investor that would *not*, under the panel's loosey-goosey standard, toll the statute of limitations forever, no matter how many storm warnings the investor has received. If gale-force winds that uproot half of one's property can be neutralized by a forecast of clear skies and mild breezes to come, then anything a defendant may say or refuse to say will, under the panel's holding, constitute deliberate concealment that prevents plaintiff from learning what he needs to bring suit. Needless to say, no other circuit has hacked this gaping hole into the statute of limitations. *See, e.g.*, *Whirlpool Fin. Corp.* v. *GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) (defendants attributed poor performance to a market recession, rather than fraud, but that couldn't have prevented plaintiffs from discovering the facts needed to bring suit); *De la Fuente* v. *DCI Telecomms., Inc.*, 206 F.R.D. 369, 385 (S.D.N.Y. 2002) (defendants' disclosures were "tempered with positive statements," but that optimism couldn't have prevented investors from discovering the facts needed to bring suit).

\* \* \*

By holding that only a jury can decide when the statute of limitations is triggered, the panel parts company with ten

other circuits and forces defendants to trial even where the historical facts aren't in dispute. By inventing a rule that the statute isn't triggered until plaintiff gets proof of every element of his claim, including scienter, the panel again breaks with ten other circuits and takes our law even deeper into uncharted waters. And by holding that the statute stops running the moment defendant makes a cheerful noise, the panel effectively writes the statute of limitations off the books. Businesses unfortunate enough to be sued in this circuit for securities fraud might as well forget about 28 U.S.C. § 1658(b)(1); it is nothing but a filigree on the statutory page.

**APPENDIX**

**OPINION**

GOULD, Circuit Judge:

We must decide whether Heide Betz's federal securities fraud claim is barred by the statute of limitations.[1] We hold that there is a genuine issue of material fact whether Betz's claim is time barred, and we reverse the district court's summary judgment for the defendants.

**I**

On an appeal of summary judgment we, like the district court, view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Viewed in the light most favorable to Betz, the facts are as follows:

In 1999, Betz, a retired art dealer, sold her house for $2.2 million. Betz planned to buy a co-op and invest the proceeds of the sale of her house to provide interest income. An employee of First Republic Bank named Carmen Castro introduced Betz to David Como, an employee of Trainer Wortham, an investment subsidiary of First Republic Bank. Como and Castro recommended that Betz invest the proceeds from the sale of her house with Trainer Wortham. Como and Castro assured Betz that, if she invested her $2.2 million with Trainer Wortham, she could withdraw $15,000 per month from her portfolio, for living expenses, without touching the $2.2 million in principal.

According to Betz, on June 7, 1999, Betz entered into an oral agreement with Como, who was acting on behalf of Trainer Wortham, giving the defendants control over her $2.2

---

[1]In a separately-filed memorandum disposition, we resolve Betz's appeal of the district court's disposition of her state law claims.

million. Betz and Como agreed that Como would invest Betz's money "in such a fashion that [Betz] would receive $15,000 a month from the profit of the investment and that [the defendants] would not touch the principal." The same day, Betz and Como, who was again acting on Trainer Wortham's behalf, entered into a written "Letter of Understanding for Portfolio Management and Administration Services" and an "Investment Management Agreement." These documents explicitly stated that Betz's account was subject to market risk and that "no person has represented to [Betz] that any particular result can or will be achieved." However, these documents also contained no "merger" or "integration" clauses and made no reference to the alleged oral agreement regarding Betz's $15,000 in monthly maintenance income.

After Betz opened her account with Trainer Wortham, she received account statements at least once per month. In February 2000, Betz received a statement reflecting an account value below her initial investment of $2.2 million. Between February 2000 and July 2001, Betz received twenty-nine more account statements, each reflecting an account balance of less than $2.2 million. In March 2001, Betz's account balance had dropped to $848,000. Around that time, Betz spoke with Robert Vile, a Trainer Wortham employee, to express concern about the declining value of her account. Vile told Betz that the declining balance was attributable to her monthly $15,000 withdrawals; he assured her, however, that the shortfall was temporary, that the market would recover, and that in a year or less her account balance would be back to $2.2 million. When subsequent account statements showed the balance of Betz's account continuing to fall, she met with Castro, who told her that there was a "serious problem" with the way Betz's portfolio had been managed and that the president of Trainer Wortham, Charles Moore, would "take care of the account because it was 'the right thing to do' and because [Trainer Wortham] value[d] their client relationships." In May 2002, after Betz had met with Moore in person, Castro called Betz to tell her that "Moore was meeting with other principals

and attorneys" regarding her account, and that Betz "should be patient with them and not take any legal action." However, in June 2002, Castro advised Betz that Trainer Wortham was "not going to do anything at all" to remedy the declining value of her account.

Betz filed her complaint in this case on July 11, 2003, alleging that Como, Vile, Trainer Wortham, and First Republic Bank (collectively, "Trainer Wortham" or "defendants") had committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5. The defendants moved for summary judgment on the ground that Betz's federal securities fraud claim was barred by the statute of limitations. Section 804(a) of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 801 (codified at 28 U.S.C. § 1658(b)), provides that a suit for securities fraud under § 10(b) of the Securities Exchange Act must be filed "not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." The district court held that, because Betz had inquiry notice of the defendants' violations of § 10(b) before July 11, 2001, Betz's claims were time barred, and on this ground the district court granted summary judgment for the defendants.

## II

We review de novo the district court's grant of summary judgment. *Olympic Pipeline Co. v. City of Seattle*, 437 F.3d 872, 877 n.11 (9th Cir. 2006). Federal Rule of Civil Procedure 56(c) entitles a party to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As we noted above, in deciding a motion for summary judgment, we

view the evidence in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.

## III

The defendants contend that Betz's suit is time barred because she had both actual and inquiry notice of the facts giving rise to her claim. Betz contends that she had neither.

**[1]** We first address actual notice. Betz's suit is timely only if she filed it "not later than . . . 2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b). Viewing the facts in the light most favorable to Betz, there is a genuine issue of fact about whether Betz actually discovered that she had a claim against the defendants for securities fraud more than two years before she filed her suit on July 11, 2003. For Betz to have a claim under § 10(b), the defendants must have had, among other things, scienter, which is the "mental state embracing intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976); *see also Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) (listing the elements of a federal securities fraud claim), *petition for cert. filed sub nom. Avis Budget Group, Inc. v. Cal. State Teachers Ret. Sys.*, No. 06-560 (U.S. filed Oct. 19, 2006). In *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999), we held that to adequately plead scienter, a § 10(b) plaintiff "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." We went on to describe this heightened pleading standard as follows:

> Our holding rests, in part, on our conclusion that Congress intended to elevate the pleading requirement above the Second Circuit standard requiring plaintiffs merely to provide facts showing simple recklessness or a motive to commit fraud and opportunity to do so. We hold that although facts showing

mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. Accordingly, we hold that particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA.

*Id.*

**[2]** We cannot say that, as a matter of law, Betz, before July 11, 2001, actually discovered facts suggesting that the defendants consciously or deliberately and recklessly deceived her. Under the version of facts presented by Betz, a reasonable factfinder could conclude that Betz did not discover that the defendants intentionally misled her into believing that she could withdraw $15,000 per month without depleting her principal until June 2002, when Moore told her that Trainer Wortham was "not going to do anything" to fix her account.

If the statute of limitations began running only upon Betz's actual discovery of the facts giving rise to her securities fraud claim, this would end our inquiry. However, the defendants contend that, even if Betz did not actually discover the facts underlying her claim before July 11, 2001, Betz was on "inquiry notice" of her claim before that date, and that her claim therefore is still barred by the statute of limitations. We address that argument in the next section.

**IV**

**A**

[3] We have held that the statute of limitations for a federal securities fraud claim begins to run when the plaintiff has either actual or inquiry notice that the defendants have made a fraudulent misrepresentation. *See, e.g.*, *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987). In more recent cases, however, it has been suggested that under the United States Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), only actual notice of the facts forming the alleged fraud, and not inquiry notice of those facts, triggers the running of the statute of limitations for a § 10(b) claim.[2] *See Berry v. Valence Tech., Inc.*, 175 F.3d 699, 704 (9th Cir. 1999); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005). The uncertainty introduced by our opinion in *Berry* led us to suggest in *Livid Holdings* that, notwithstanding our unequivocal pre-*Lampf* case law, we had "considered, but not made a final determination on whether actual or inquiry notice of the alleged fraud triggers the running of Rule 10b-5's statute of limitations." *Livid Holdings*, 416 F.3d at 951.

[4] In *Lampf*, the Supreme Court resolved a split among the circuits regarding the statute of limitations applicable to a § 10(b) claim. *See Lampf*, 501 U.S. at 354. Some circuits had borrowed state statutes of limitations, while others had established a unique federal limitations period. *See id.* at 354 n.1. The Supreme Court in *Lampf* held that the statute of limita-

---

[2]Though *Gray* was decided after the Supreme Court handed down *Lampf*, in *Gray* we applied pre-*Lampf* statute of limitations principles pursuant to 15 U.S.C. § 78aa-1(a), which provides that pre-*Lampf* limitations periods apply to suits filed before *Lampf* was decided. *See Gray*, 82 F.3d at 879 n.1, 880-81.

tions provided in § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e), was the appropriate standard. *See Lampf*, 501 U.S. at 364 n.9. Section 9(e) provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."[3] No one disputes that "discovery" can occur when a plaintiff actually discovers facts giving rise to his or her claim. However, *Lampf* left it to the lower courts to decide whether "discovery" occurs *only* upon actual notice or whether "discovery" can occur on some form of inquiry notice.

[5] We hold that either actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim. While it is unquestioned that actual notice can mark the beginning of the limitations period, two things happened in the aftermath of *Lampf* that convince us that an inquiry notice standard should also apply to federal securities fraud claims. First, the courts of appeal in our sister circuits, along with the district courts in our own circuit, have uniformly embraced inquiry notice. In fact, "every circuit to have addressed the issue since *Lampf* has held that inquiry notice is the appropriate standard." *Berry*, 175 F.3d at 704; *see Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 450 F.3d 1257, 1267-68 (11th Cir. 2006); *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006); *Glaser v. Enzo Biochem, Inc.*, 126 Fed. App'x 593, 597 (4th Cir. 2005) (citing *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 500 (6th Cir. 2003); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002); *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002); *Ritchey v. Horner*, 244 F.3d 635, 638-39 (8th Cir. 2001); *Sterlin v. Biomune Sys.*, 154 F.3d

---

[3] The one year/three year limitations period set forth in § 9(e) still applies to securities fraud suits filed before the enactment date of Sarbanes-Oxley, July 30, 2002. *See* Sarbanes-Oxley Act § 804(b).

1191, 1199-1200 (10th Cir. 1998); *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997); *Topalian v. Ehrman*, 954 F.2d 1125, 1134-35 (5th Cir. 1992). Likewise, the district courts in our circuit regularly apply an inquiry notice standard to § 10(b) claims. *See, e.g.*, *In re Micron Techs., Inc. Sec. Litig.*, No. CV-06-085-S-BLW, 2007 WL 576468, at *4 (D. Idaho Feb. 21, 2007); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1026 (S.D. Cal. 2005); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1113 (C.D. Cal. 2003); *Getty v. Harmon*, 53 F. Supp. 2d 1053, 1055 (W.D. Wash. 1999); *Freedman v. La.-Pac. Corp.*, 922 F. Supp. 377, 395 (D. Or. 1996); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1099 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996); *Aizuss v. Commonwealth Equity Trust*, 847 F. Supp. 1482, 1486 (E.D. Cal. 1993). While not binding on us, the reasoned opinions of ten of our sister circuits and the widespread practices of the district courts in our own circuit weigh heavily in favor of holding that inquiry notice can trigger the running of the statute of limitations on a securities fraud claim. The uniformity of the precedent in this direction sends a signal message that inquiry notice, and not merely actual notice, can cause the statute of limitations for securities fraud to begin to run.

**[6]** The second post-*Lampf* event that convinces us that an inquiry notice standard is appropriate is an act of Congress. In the Sarbanes-Oxley Act of 2002, Congress extended the limitations period for § 10(b) suits from "one year after the discovery of the facts constituting the violation," 15 U.S.C. § 78i(e), to "2 years after the discovery of the facts constituting the violation" for actions commenced after July 30, 2002, 28 U.S.C. § 1658(b); Sarbanes-Oxley Act, § 804(b). In its new enactment, Congress opted for language identical to the language previously in effect in § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e). The Supreme Court has instructed that we should assume that Congress is aware of the prevailing case law and legislates in its light. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979) ("It is

always appropriate to assume that our elected representatives, like other citizens, know the law . . . ."); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379 (1982) (interpreting the Commodity Exchange Act in light of pre-enactment case law). In 2002, the prevailing case law in the lower federal courts interpreted the language of § 9(e) to mean that the limitations period could be commenced upon some form of inquiry notice. By choosing language nearly identical to the language of § 9(e), Congress implicitly approved of that case law. *See Cannon*, 441 U.S. at 696-99 (interpreting Title IX to provide a private cause of action because Congress used language identical to that found in Title VI, which had already been interpreted by the courts to provide a private cause of action); *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (per curiam) (holding that the silence of the Class Action Fairness Act regarding the burden of proving removal jurisdiction indicated Congressional intent to leave intact the common law rule placing the burden on the defendant); *United States v. Male Juvenile*, 280 F.3d 1008, 1016 (9th Cir. 2002) (noting that "[i]n construing statutes, we presume Congress legislated with awareness of relevant judicial decisions" and holding that Congress's failure to explicitly include "tribal governments" within the Federal Juvenile Delinquency Act's definition of "State," when amending other parts of the Act, "may be interpreted as an endorsement of the judicial decisions excluding tribes from the definition of 'State' ").

**[7]** We recognize that the pragmatic effects of applying an inquiry notice standard to § 10(b) are both positive and negative for individual litigants. As was suggested in *Berry*, a case decided under the old one-year limitations period, such a standard may compel plaintiffs to file a suit based on "skimpy facts." *See Berry*, 175 F.3d at 704 n.6 (quoting Charles Benjamin Nutley, Comment, *Triggering One-Year Limitations on Section 10(b) and Rule 10b-5 Actions: Actual or Inquiry Discovery?*, 30 San Diego L. Rev. 917, 948 (1993)). However, Congress's extension of the relevant limitations period from

one to two years alleviates this concern and allows us to conclude that an inquiry notice standard strikes an acceptable balance between the interest in requiring plaintiffs promptly to file suit and the competing interest in avoiding the encouragement of baseless or premature suits by requiring plaintiffs to sue before they can discover the facts underlying their claims. *See New England Health Care Employees Pension Fund*, 336 F.3d at 501; *Young*, 305 F.3d at 9; *Sterlin*, 154 F.3d at 1202.

## B

**[8]** We have previously stated that, if we were to adopt an inquiry notice standard for § 10(b) suits, we would apply a standard similar to that applied by the Tenth Circuit. *See Livid Holdings*, 416 F.3d at 951; *Berry*, 175 F.3d at 704. Today we adopt the inquiry-plus-reasonable-diligence test used by the Tenth Circuit. *See, e.g.*, *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998) (holding that inquiry notice "triggers an investor's duty to exercise reasonable diligence and that the . . . statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."). Under that standard, to determine when the statute of limitations begins running, we first determine when the plaintiff had inquiry notice of the facts giving rise to his or her securities fraud claim. A plaintiff is on inquiry notice when there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further. Like our sister circuits, we caution that inquiry notice should not be construed so broadly that the particular plaintiff cannot bring his or her suit within the limitations period. The facts constituting inquiry notice "must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion . . . to incite the victim to investigate." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997), *quoted in Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1284 (11th Cir. 2005). Once a plaintiff has inquiry notice, we ask when the investor, in the exercise of reasonable diligence, should have discov-

ered the facts constituting the alleged fraud. The answer to that second question tells us when the statute of limitations began to run.

**[9]** The question of whether inquiry notice exists is objective and contemplates a "reasonable investor" or "reasonable person" standard. *See, e.g.*, *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (citations and internal quotation marks omitted) (holding that inquiry notice of securities fraud is triggered when the plaintiff receives "sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved"); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001) (holding that inquiry notice exists where "a reasonable investor of ordinary intelligence would have discovered the [suspicious] information and recognized it" as suspicious); *Great Rivers Coop. of S.E. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 896 (8th Cir. 1997) (inquiry notice is present "when the victim is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations."). The existence of inquiry notice is only the first prong of the two-part notice-plus-reasonable-diligence test that we are today adopting, and the second stage of that inquiry, the question of whether the plaintiff exercised reasonable diligence in investigating the facts underlying the alleged fraud, while remaining essentially objective in character, necessarily entails an assessment of the plaintiff's particular circumstances from the perspective of a reasonable investor. In this second stage of the inquiry, one of the factors to be considered is whether the plaintiff was given any assurances by a defendant after beginning to investigate the suspicious circumstances that would have delayed discovery of the fraud by a reasonable person in the plaintiff's position. For example, in a situation much like the instant case, we have held that, when an investor met with representatives of a defendant company about possible fraud and was assured that there "had been no improprieties," whether the statute of limitations began run-

ning was a question for the trier of fact. *See SEC v. Seaboard Corp.*, 677 F.2d 1301, 1310 (1982). In that case, we concluded that "the question of what a reasonable investor would have done [under those circumstances] is not so certain as to allow a determination as a matter of law." *Id.*

Moreover, under the notice-plus-reasonable-diligence standard we apply to securities fraud claims, the defendant bears a considerable burden in demonstrating, at the summary judgment stage, that the plaintiff's claim is time barred. *See Seaboard Corp.*, 677 F.2d at 1309-10 (noting that "the question of notice of fraud is for the trier of fact" and that "the party seeking summary disposition has an extremely difficult burden to show that there exists no issue of material fact regarding notice"). "Summary judgment is appropriate only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Gray*, 82 F.3d at 881 (internal quotations omitted); *see also Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. 1984) ("The question of what a reasonably prudent investor should have known is particularly suited to a jury determination.").[4] Our hesitation to approve summary

_____

[4]We have in some cases resolved by summary judgment the question of whether a federal securities plaintiff had sufficient notice of alleged fraud to trigger the statute of limitations. For example, in *Davis v. Birr, Wilson & Co.*, 839 F.2d 1369 (9th Cir. 1988) (per curiam), a case predating our adoption of the inquiry-plus-reasonable-diligence standard for inquiry notice in federal securities fraud cases, we concluded that summary judgment on the issue of notice was proper where the plaintiff took an active role in the management of his investments and made suggestions to his broker about his portfolio. *See id.* at 1370. By contrast, Betz merely expressed generalized concerns about her declining account balance, in response to which, if we credit Betz's testimony, she received specific assurances from the president of Trainer Wortham that her account problems would be resolved and that she should forego suit. No such evidence of assurances from the highest levels of the defendant securities firm was present in *Davis*. We also affirmed a summary judgment recognizing inquiry notice in the case of *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406 (9th Cir. 1987). *Volk* involved several investors who purchased limited

judgment in securities fraud cases is especially pronounced where the plaintiff alleges that the defendants' reassurances convinced the plaintiff to postpone his or her legal action. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984).

We now turn to the facts of this case. Under our inquiry notice standard outlined above, and keeping in mind that this case is before us on summary judgment, we ask whether there is a genuine dispute about whether there existed facts sufficiently probative of fraud to cause a reasonable investor to conduct a further investigation. Viewing the facts in the light most favorable to Betz, a rational jury could conclude that a reasonable investor in Betz's shoes would not have initiated further inquiry before July 11, 2001.

---

partnership interests in coal mining operations marketed as tax shelters and who were subsequently informed by the general partner both through a letter and an annual report that the partnership properties did not contain minable coal reserves as warranted and that the investors might therefore not be legally entitled to the tax deductions they had been taking. *Id.* at 1409-10. The investors argued that the statute of limitations on their securities fraud claim did not begin running until the IRS disallowed their deductions and they first suffered out-of-pocket losses, but the court held as a matter of law that the statute began to run when they received the letter and annual report from the general partner putting them on inquiry notice of the problem with the coal reserves. *See id.* at 1411. However, *Volk* differs from the case before us in that the warnings that the *Volk* investors received indicated a much more permanent and fundamental type of problem with the underlying investment than the declining account balances experienced by Betz, which, at least in theory, could have reversed themselves over time. In addition, while some of the investors in *Volk* also received reassurances from the defendant investment company when they expressed concerns about the general partner's communications, these assurances took the general form of admonitions "not to worry" about the letter, *id.*, whereas in Betz's case she claims that she was specifically promised that the president of Trainer Wortham would remedy the problems with her account because it was "the right thing to do" and that in the meantime she should refrain from taking any legal action against the company.

**[10]** The defendants contend that the account statements Betz received would have spurred a reasonable investor to inquire further whether Trainer Wortham had defrauded her. However, the account statements indicated, at most, that the defendants had failed to fulfill their oral promise that Betz could withdraw $15,000 per month from her account without depleting the principal. As a matter of law, we cannot say that a declining account balance, in and of itself, would have spurred a reasonable investor to further inquire whether he or she had been *defrauded*. *See Gray*, 82 F.3d at 881 ("It is well settled that poor financial performance, standing alone, does not necessarily suggest securities fraud . . . , but could also be explained by poor management, general market conditions, or other events unrelated to fraud, creating a jury question on inquiry notice."); *see also Livid Holdings*, 416 F.3d at 951 ("This court has held that financial problems alone are generally insufficient to suggest fraud.").

**[11]** Likewise, Castro's statement that there was a "serious problem" with Betz's portfolio did nothing more than indicate to Betz that the defendants had not been able to make good on their promise of at least $15,000 per month in interest income. Because such a statement provided no evidence that the defendants had intentionally or deliberately and recklessly misled Betz as *Silicon Graphics* requires to state a claim for securities fraud, *see Silicon Graphics*, 183 F.3d at 974, a rational jury could conclude that, upon hearing such a statement, a reasonable investor would not have initiated further inquiry into the existence of fraud. *See Fujisawa Pharm.*, 115 F.3d at 1335 (noting that "[t]he facts constituting [inquiry] notice must be sufficiently probative of *fraud*" (emphasis added)).

Moreover, even if Betz was on inquiry notice of fraud, under the second prong of our inquiry notice standard, we cannot say that, as a matter of law, Betz, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud. In this case, Betz questioned the

defendants about her account and the defendants assured her that they would take care of any problems and asked her not to file suit. In *Seabord Corp.*, the defendant's giving of assurances in response to a codefendant's inquiries, which had the effect of lulling the codefendant and delaying the onset of legal action, was held to preclude summary judgment and create an issue for the trier of fact as to when the statute of limitations began to run. *See Seaboard Corp.*, 677 F.2d at 1310. Trainer & Wortham's assurances to Betz in this case, which were given as recently as May of 2002, similarly give rise to a fact issue which makes summary judgment inappropriate.

We do not suggest, however, that there is a *per se* rule that in all cases involving assurances from a brokerage firm to an investor, the issue of inquiry notice must go to a jury. Rather, we conclude that here, in the total circumstances, and from the point of view of a reasonable investor, there was a genuine issue whether Betz should be held to have had notice of securities fraud.

## V

**[12]** In summary, we hold that, once there exists sufficient indicia of fraud to cause a reasonable investor to inquire into whether he or she has been defrauded, the statute of limitations on a claim under § 10(b) of the Securities Exchange Act begins running when the investor, in the exercise of reasonable diligence, should have discovered the facts giving rise to his or her claim. In this case, we cannot say that, as a matter of law, a reasonable investor in Betz's position should have discovered the facts giving rise to her claim before July 11, 2001, especially in light of the express assurances made by Defendants that they would remedy the problems with the account, which may have lulled a reasonable investor into inaction. Thus, a jury must determine whether a reasonable investor would have discovered the fraud while receiving active assurances from the highest levels of the securities firm

that there was no problem with her account and all would be made right. We reverse the district court's judgment in favor of the defendants and remand this case for further proceedings consistent with our opinion.

**REVERSED AND REMANDED.**